## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 13 2018, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes Kolbus Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Enedeo Rodriguez, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 13, 2018 <br><br> Court of Appeals Case No. 20A03-1707-CR-1607 <br><br> Appeal from the Elkhart Circuit Court <br><br> The Honorable Michael A. Christofeno, Judge <br><br> Trial Court Cause No. 20C01-1611-F2-31 |

**Barnes, Judge.**

# Case Summary

[1] Enedeo Rodriguez, Jr., appeals his convictions and thirty-two-year sentence for Level 2 felony dealing in methamphetamine and Level 5 felony corrupt business influence. We affirm.

# Issues

[2] The issues before us are as follows:

    I.      whether Rodriguez was improperly denied a fast and speedy trial;

    II.     whether the trial court erred in denying Rodriguez's motion for severance;

    III.    whether sufficient evidence exists to support Rodriguez's convictions;

    IV.    whether the trial court's instructions to the jury resulted in fundamental error; and

    V.     whether Rodriguez's thirty-two-year sentence is inappropriate given the nature of his offenses and his character.

# Facts

[3] In 2016, Elkhart County Interdiction Covert Enforcement ("ICE"), working with other state and federal law enforcement agencies, received a tip that Alejandro Nava Rodriguez ("Nava") was dealing methamphetamine.

Investigators began monitoring and conducting hand-to-hand purchases[1] from Nava, and his associates, Luis Jaquez and Jorge Moreida. Investigators suspected that the three men were methamphetamine dealers and that they were working with a nearby supplier. Using the "buying through" technique, investigators placed large orders intended to "force [the dealers] to go to [their] supplier" and to lead investigators to the source of the methamphetamine. Tr. Vol. III pp. 183-84. Investigators obtained court orders that allowed for wiretaps, pen registers, and "pings," which provided GPS location data for each investigative subject's cell phone.

[4] Rodriguez resided in New Paris and owned R&R Auto ("R&R"), an auto repair and resale business in Elkhart. Video surveillance frequently captured Moreida at R&R; he would later testify that he worked there occasionally, despite not being on the company's payroll. Wire surveillance also revealed that Moreida and Rodriguez telephoned each other frequently and used language that investigators believed to be coded references to methamphetamine.

[5] On April 18, 2016, investigators conducted a hand-to-hand purchase of methamphetamine from Nava. Nava initially met with an undercover officer to hash out the terms of the deal, drove to Jaquez's house, and then delivered a

---

[1] Undercover investigator UC 323 testified as to the distinction between a "controlled buy" and a "hand-to-hand" purchase as follows: "A controlled purchase is with the use of a confidential informant, and a hand-to-hand purchase is any time a[n] undercover officer purchase[s] hand-to-hand from a person." Tr. Vol. IV p. 98.

quarter pound of methamphetamine to the undercover officer. In all, investigators conducted five hand-to-hand purchases from Nava and two from Jaquez. They "were trying to determine whether Mr. Jaquez . . . was above or below Nava" in the drug operation's hierarchy. Tr. Vol. III p. 198.

[6] On June 29, 2016, investigators conducted a hand-to-hand purchase of four ounces of methamphetamine from Moreida for $4,000. On August 23, 2016, an undercover officer ("UC 3749") went to Moreida's house and agreed to buy an additional half-pound of methamphetamine for $6,400. Moreida told UC 3749 "that he could make it happen; [but that] it would have to be later in that day." Tr. Vol. IV p. 23. Afterwards, wire surveillance revealed that Moreida telephoned Rodriguez, drove to meet him in Elkhart, and that the men drove together to Rodriguez's house in New Paris, remaining there only briefly. Moreida then dropped Rodriguez off at R&R and delivered one-half pound of methamphetamine to UC 3749.

[7] On September 10, 2016, wire surveillance of Nava and Jaquez's cell phone conversations revealed "that they were out" of methamphetamine. Tr. Vol. III p. 203. Thereafter, GPS data revealed that Rodriguez drove seventy miles to Fort Wayne, remained there for only twenty minutes, and returned to Elkhart. While Rodriguez was en route back to Elkhart, investigators overheard Jaquez and Moreida saying "that the meth, or the dope, or the onions, or whatever they were calling it that day, was coming, [and] it was close. So, [investigators] kind of put two and two together." *Id*. at 204.

[8]     Investigators were in concealed positions outside Rodriguez's house when he returned home. They watched as he backed his truck up to his garage, removed a cardboard box from the truck bed, and carried the box into the garage. Approximately twenty minutes later, Rodriguez replaced the same box on his truck bed and covered it with a heavy blanket. An investigator followed in an unmarked car as Rodriguez drove to Jaquez's house, backed up his truck to Jaquez's garage, removed the blanket, and carried the box into Jaquez's garage. Rodriguez left within ten minutes. After Rodriguez left, the wire surveillance team alerted the on-site surveillance team that Nava was now en route to Jaquez's house. Nava arrived soon thereafter, remained onsite only briefly, and then drove to see Juan Rivera, from whom investigators conducted several hand-to-hand purchases during this investigation. *Id.* at 214.

[9]     On October 22, 2016, UC 3749 conducted a hand-to-hand purchase of methamphetamine from Moreida. On October 28, 2016, while he was at R&R Auto, Moreida sent a text message to UC 3749 and offered to sell him more methamphetamine. For this hand-to-hand purchase, in addition to wire surveillance and an on-site surveillance unit, investigators also enlisted helicopter surveillance support with video recording capacity. On-site undercover investigators observed as Moreida negotiated with UC 3749. Rodriguez was present for the negotiation, and both men appear in the helicopter surveillance video of the transaction. Moreida and UC 3749 agreed on an $11,000 price for one pound of methamphetamine.

[10]     Rodriguez and Moreida then drove to Rodriguez's house, remaining there briefly, during which time Rodriguez retrieved an item, believed to be a digital scale from a vehicle, before re-entering the house. The men then drove to a cell phone store in Elkhart. Rodriguez went into the store, while Moreida proceeded to deliver the methamphetamine to UC 3749 at a nearby dry-cleaning establishment. Afterwards, Moreida picked up Rodriguez.

[11]     By now, investigators suspected that Rodriguez was a major methamphetamine supplier: Moreida had both called Rodriguez and received several phone calls from Rodriguez around the time of transactions; Moreida had "trip[ped]" to Rodriguez, whose travel patterns and conduct suggested that he may be a supplier to Jaquez, Nava, and Moreida; and Rodriguez "was physically present or near" at the time of two hand-to-hand purchases coordinated by Moreida. Tr. Vol. IV p. 20. Investigators also suspected that Rodriguez was transporting methamphetamine in R&R's vehicles and conducted surveillance on R&R "for several weeks" during the investigation. Tr. Vol. III p. 216.

[12]     Investigators executed a federal search warrant at Rodriguez's house on November 2, 2016.[2] Rodriguez, his wife, and a young child were present when the search warrant was executed. The November 2, 2016 search yielded a significant quantity of methamphetamine in the basement, along with a measuring cup, two digital scales, two vacuum sealing machines, large,

---

[2] The police also recovered documents that indicated Rodriguez owned or resided in the house.

industrial resealable bags, bulk quantities of cellophane, a cutting agent, and at least six cell phones. Investigators also recovered methamphetamine crystals and smoking devices from Rodriguez's garage and 240 grams of methamphetamine and a large supply of resealable bags from the stereo speaker of a truck that was parked outside Rodriguez's house.

[13] On November 8, 2016, the State charged Rodriguez with Level 2 felony dealing in methamphetamine and Level 5 felony corrupt business influence.[3] As to the latter, the State alleged that Rodriguez, Nava, Rivera, Jaquez, and Moreida engaged in a pattern of racketeering activity and aided and abetted one another to deal, attempt to deal, or conspire to deal methamphetamine.

[14] At his initial hearing on November 10, 2016, and after the trial court granted his request for a public defender, Rodriguez moved orally for a speedy trial, which motion was denied so Rodriguez could consult with his counsel. The trial court stated,

> THE COURT: Now, Mr. Rodriguez, with respect to a motion for an early trial under the trial rules, which people refer to as a fast and speedy trial, that is a motion that has to be made by your attorney. So talk to your attorney about whether or not that is in your best interest to do that. He or she will make that determination on your behalf after consulting with you.

---

[3] As to Count II, the State charged the five co-defendants jointly. Trial was initially set for Jaquez on March 20, 2017, and for the remaining four defendants on April 3, 2017. *See* Tr. Vol. II pp. 30-31.

\* \* \* \* \*

THE DEFENDANT: I'm still requesting a fast and speedy trial.

\* \* \* \* \*

THE COURT: -- that's fine. And I'm denying your request for two reasons: Number one, it's not in writing; and number two, I can't accept a request from you. It has to come through your attorney.

Tr. Vol. II pp. 10-11.

On November 16, 2016, despite being represented by counsel, Rodriguez submitted, pro se, a letter to the trial court in which he requested a fast and speedy trial. The following day, Rodriguez's appointed counsel entered his appearance. At a hearing on December 8, 2016, Rodriguez's counsel opposed his speedy trial request and asked the trial court to withdraw the motion.[4] Rodriguez asked to be heard and the following colloquy ensued:

THE COURT: Your attorney has spoken to you about this case. Is that correct?

THE DEFENDANT: Yes, Your Honor.

---

[4] The trial court noted that counsel for Rodriguez was still awaiting discovery; cited the likelihood that extensive discovery needed to be undertaken regarding the corrupt business influence charge; and noted that counsel needed additional time to prepare a defense.

THE COURT: And without going into the substance of what you spoke about, did he explain to you the possible pitfalls if he is required to proceed to trial within 70 days of the filing -- of your filing of the fast and speedy trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you understand that if I grant your fast and speedy trial that your attorney may or may not be prepared to proceed to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you understand that because we're having this discussion now, and if you are convicted and you are going to raise the argument of ineffective assistance of counsel that that will probably -- even if he is ineffective -- it will probably be upheld due to the fact that we're having this discussion now. And I'm explaining to you that if you want your fast and speedy trial that it will be placed within 70 days of November 16 of 2016.

THE DEFENDANT: Yes, Your Honor.

THE COURT: And that if your attorney is not ready to proceed to trial, I will not grant you a continuance. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And so then we will proceed to a jury trial. If you are convicted at that jury trial that one of the possible remedies or appeal routes will be foregone by you because of your decision today.

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you still wish to have a fast and speedy trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So you understand that you are forcing your attorney to be prepared in this case, and he may not have all the information he needs to either protect your assets from being forfeited to the State of Indiana. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you are willing to place your assets and/or your liberty in jeopardy to proceed with a fast and speedy [trial?]

THE DEFENDANT: Yes, Your Honor.

*Id*. at 17-19. Rodriguez's counsel reiterated his view that Rodriguez was "making a decision that [wa]s clearly against his best interest" and asked that the motion be denied. *Id*. at 19. The trial court struck Rodriguez's request as a pro se filing after appointment of counsel and, in the alternative, denied it.

[16] Although the timing is unclear from the record, Rodriguez and Moreida exchanged letters in jail. Rodriguez urged Moreida to reject the State's plea offer and to take the fall, in exchange for everyone "accept[ing] . . . and car[ing] for [him]." *Id*. at 131. Moreida perceived Rodriguez's letters as threatening.

State's Ex. 9; *see* Tr. Vol. II p. 128 ("In prison don't worry [about] fighting, it's the gossip that will kill you.").

[17] On March 7, 2017, the State filed a motion to consolidate, seeking to join Rodriguez's trial with that of Nava, who was to be tried on June 5, 2017. The trial court denied the motion; however, at a hearing on March 30, 2017, the trial court advised that Rodriguez's jury trial, slated for April 3, 2017, was unlikely to proceed as scheduled because another matter was scheduled ahead of his. The trial court also noted that discovery was still "ongoing."[5] *Id.* at 37. The trial court advised Rodriguez that his counsel needed additional time to review newly-disclosed evidence and that the court's calendar would not allow for trial on April 3, 2017. Subsequently, Rodriguez's jury trial was continued to June 5, 2017 due to court congestion and to allow counsel time to review newly-disclosed evidence.

[18] At a hearing on March 30, 2017, the following colloquy ensued:

> THE COURT: I just want to make sure that you -- that the State's turned over what it has and what it knows so that Mr. Soldato and Mr. Rodriguez can get ready for trial. Now, you know, the first thing that comes up, Mr. Rodriguez, is Mr. Soldato and you need time to go over this.

---

[5] The State acknowledged that it had received new documentation from the ATF "at the last minute" and that it had submitted the materials, consisting of sixty pages "plus four or six discs worth of . . . video and some kind of telephonic surveillance" to counsel for Rodriguez. Tr. Vol. II pp. 38, 39.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you agree with that?

THE DEFENDANT: Yes. But in -- in that same thing, what do you mean by time? Like, a continuance time? Or . . . .

THE COURT: Well, I don't think you're going to be able to go over that by Monday. Number one, I don't think your case is going to go to trial Monday.

* * * * *

THE COURT: But number two, I don't think you're going to be ready. You know, you have to discuss that with Mr. Soldato. I -- I just know that getting that amount of information that he hasn't reviewed you, it -- it occurs to the Court, Mr. Rodriguez, you might want to review that with your counsel before you were in court and that was the first time that you're hearing the evidence.

THE DEFENDANT: Yes, Your Honor.

THE COURT: I -- I'm not -- I'm not giving you legal advice, and I'm not telling you what to do. I am suggesting that I want to make sure you get a fair trial, Mr. Rodriguez.

* * * * *

THE COURT: And it -- and it seems to me that if the first time you're hearing the evidence is when you're seated at that very seat and a jury is in that box, that's not going to give you a fair trial.

THE DEFENDANT: Your Honor, with all due respect, I know -- I know what I did do and what I didn't do, and I'm ready for trial.

THE COURT: I -- I don't want you to say anything like -- like -- you're represented by counsel, and I don't want you to blurt something out that you're going to regret, Mr. Rodriguez.

THE DEFENDANT: Okay.

THE COURT: Okay.  I don't want to give you the idea that I'm trying to suggest you start talking about things.

THE DEFENDANT: No. I -- I'm just ready for trial.  I'm just ready for trial.

THE COURT: Okay.  You do understand that if another case goes to trial on Monday, you won't go to trial.  You do understand that?

* * * * *

THE COURT: And then we would reset your case.  You do understand that?

THE DEFENDANT: Okay.

THE COURT: Okay.

THE DEFENDANT: Until -- until when?  Or...

THE COURT: I would have to look at the Court's calendar, but I would imagine -- I believe it's June 5.

* * * * *

MR. SOLDATO: I think Mr. Rodriguez's one concern is that -- and I've explained to him it's the Court's prerogative on when it resets the trial to. But he would if -- he would ask for an earlier trial date, if possible, before the June date.

THE COURT: Well, I will go this far, Mr. Rodriguez; I will consider that. The problem I think you've got is this: That, as you are well aware, this is a busy court. And so the problem is, you know, we're setting these trials. It isn't just one or two cases that are getting set on a trial date. It's 15 or more. So the problem is when you start looking at it -- at a time before June 5, let -- let me tell you what I'm trying to do so accommodate you. And I don't know for certain that it's that June 5 date, but I think that was one of the dates where -- where when the Court was looking at things. . . . So when you're taking into account, you know, how upset you're going to be with what's going on, I'm already trying to move you up because I know you want to have a sooner trial date. Okay? That's why I suggested the June 5 date. I'll look at the others, but the trouble is if you get put on one of those other dates, Mr. Rodriguez, and your case doesn't go because other cases do, the same thing is going to happen that happened on Monday. You know, another case goes, your case doesn't go, you get put further down the line. That's why the Court was suggesting June 5.

THE DEFENDANT: Okay.

* * * * *

THE DEFENDANT: Okay.  Are you going release me on my own recognizance?

THE COURT: No, I'm not.[6]

THE DEFENDANT: Okay.

THE COURT: I'm not.  I'm not. And -- and the other thing that I would suggest is: You've got counsel, and you need to work through your counsel with the Court.  When -- when you write the Court letters --

THE DEFENDANT: Yes.

THE COURT: -- you need to understand the Court can't act on those letters. I can't do anything about that because you're -- because you're represented by counsel, you need to work through your counsel with the Court.  And right now, you've got a lot to do.  You've got a lot to do because you've got a lot discovery to go through to get ready for trial.  I know you've indicated you're ready.  I would suspect that Mr. Soldato is going to want to get your take on some of that evidence.

\* \* \* \* \*

THE COURT: . . .[R]ight now, your case is scheduled for April 3rd for trial.  Now, if the other case goes, your case isn't going. I'm telling you that flat out because I want you to know that. And it'll get continued, and I'll look down the road and I'll try and pick a date when I think you're going to get fit in.  My

---

[6] At his bond reduction hearing on December 8, 2016, the trial court determined that Rodriguez was a flight risk.

recollection June 5 was that date, which -- which would -- if you moved for a speedy trial right now, would be right around the speedy trial time, I would also add.

\* \* \* \* \*

THE COURT: Okay. Mr. Rodriguez, when you were in court --

THE DEFENDANT: Yes.

THE COURT: -- you acknowledged the trial setting. I don't think you're listening to what the Court's saying. You said you wanted it set April 3rd, and the Court set it April 3 and you said that was okay. And now you want to blame your attorney that it was set April 3rd. That's not fair and that's not right.

\* \* \* \* \*

THE COURT: -- you're getting what you bargained for. You wanted a trial April 3rd, and that's what you're going to get if the other case does not go to trial on April 3rd. If the other case goes to trial on April 3rd, which right now it is, then guess what? Your case is going to get continued by congestion. . . .

*Id*. at 39-46.

[19]    On April 13, 2017, counsel made the following record regarding Rodriguez's objection to the June 5, 2017 trial date being outside the seventy-day speedy trial period:

MR. SOLDATO: . . . . Today, we are acknowledging the June 5th trial date, but Mr. Rodriguez, personally, is objecting because

it is outside of 70 days. And I'll -- I'll explain why I'm making that request now, if I might.

On November 10th when Mr. Rodriguez had his initial hearing, he orally requested a speedy trial. Magistrate denied the speedy trial because public defender was about to be appointed. And Magistrate Osterday instructed Mr. Rodriguez to discuss that issue with counsel, which turned out to be myself. So at the next hearing, which was December 8th, 2016, we took up the issue of the early trial.

Now, in--between the initial hearing and the December 8th hearing, Mr. Rodriguez had written a -- and filed a motion for early trial on his own without my approval or consent. At the December 8th hearing, we took up the issue. I requested that the Court withdraw Mr. Rodriguez -- his filing for the speedy trial because I did not think, given the extent of discovery, I could be ready for trial within 70 days.

Over my objection, Mr. Rodriguez continuously asserted that he wanted to be tried within 70 days at that hearing. Judge Cataldo . . . denied the early trial. Mr. Rodriguez, all along, as the Court is well aware, has consistently maintained that he wants to be tried within 70 days, over even my objection.

Obviously, this June 5th trial date is outside of that 70 days. I understand that I have asked not to be tried within 70 days, personally, in this case. But I think Mr. Rodriguez's argument that he wants to preserve, if this case were to be appealed, is that that request for trial within 70 days should be a right that is personal to him. He shouldn't be able to be trumped by defense counsel on that issue.

So that's a long way of saying, Your Honor, we're acknowledging the trial date. But Mr. Rodriguez, personally,

wants to continue objecting because he has asserted from day one that he should have had a speedy trial in this case. Thank you.

THE COURT: Okay. Mr. Soldato and Mr. Rodriguez, I think that was a long way of saying you now acknowledge that your case is set for trial June 5, 2017, at 8:30 a.m. Is the Court correct in that?

MR. SOLDATO: That's correct.

THE COURT: Mr. Rodriguez, is that correct?

THE DEFENDANT: Yes.

\* \* \* \* \*

THE COURT: Okay. So now, let's get back to it. You understand your case is set for trial June 5, 2017, at 8:30 a.m. Correct?

THE DEFENDANT: Correct.

*Id.* at 48-51. The trial court added,

I can tell you this, and I think I told you this last time. I think you have a better chance of your case going to trial June 5 than you did April 3, and it turns out the Court was right on that because there was another case . . . on April 3rd, which is why you got bumped to June 5. Okay?

*Id.* at 52. The judge added that, because Rodriguez's codefendants were all slated for trial on June 5, 2017, "[I]t's more likely that June 5 date may go[.]"

*Id*. at 53.  Thus, the trial court scheduled trial for June 5, 2017.  At a hearing on May 11, 2017, Rodriguez agreed that the trial date complied with his speedy trial request.

[20]  On May 16, 2017, Rodriguez's counsel also filed a motion to sever the counts in the information, arguing that Rodriguez would suffer prejudice as to count I if the jury heard evidence on count II.  Counsel asked that the counts be tried separately.  After a hearing on June 1, 2017, the trial court denied Rodriguez's motion to sever counts for trial, finding "a sufficient connection [between counts I and II] to allow the State to go forward" and concluded that through "extensive voir dire of the prospective jurors, . . . arguments by [defense counsel], [and] . . . more detailed specific jury instructions," Rodriguez would suffer no prejudice.  *Id*. at 86.

[21]  On June 5 and 6, 2017, Rodriguez and Nava were tried by jury simultaneously.[7] Law enforcement witnesses testified to the foregoing facts.  UC 382 testified about "certain language and jargon" and common practices of drug dealers.  *Id*. at 191; Tr. Vol. IV p. 36.  He testified as follows regarding the drug interdiction tactic known as "trip[ping]":

> So, when you get to the more medium to higher level dealers,
> what they do is they will do whatever they can to avoid being in

---

[7] As to Nava, the State's charging information alleged the following offenses:  Counts I to V, five counts of Level 2 felony dealing in methamphetamine; and Count VI, level 5 felony corrupt business influence.  By the time of trial, Moreida, Jaquez, and Rivera had entered plea agreements with the State.

possession of a large amount of meth, or controlled substance at one time. And, often times, they don't want to have both the meth and money in one spot, which leads to getting to robbed, especially, if you've been dealing for a long time, people know you, your pattern. So, what they'll do is they will not hold the meth at their home and often times they'll come to it by location, make sure you have the money, or take the money, and trip to somewhere else to get the meth and then bring it back. A lot of times they believe it insulates them from holding the meth on them. Also, it eliminates traffic at their house, so, if a drug dealer lives in one location, he doesn't want all of his customers coming to and from. . . . So, they do the best they can to avoid that. So, they do it away, another location, and they keep the dope and the money separate, which causes them, or forces them to trip, a lot more back and forth.

Tr. Vol. III p. 186-87.

[22] Moreida testified on behalf of the State. At the time, he had entered a guilty plea and was awaiting sentencing. He testified that Rodriguez, who was friends with his older brother, had approached him and asked to meet at Rodriguez's house in New Paris. Rodriguez then "asked for [Moreida's] help" in selling methamphetamine and asked to store methamphetamine at Moreida's house. Tr. Vol. IV p. 113. Moreida also testified that he and Rodriguez sold "[m]eth and drugs" together for approximately one and one-half years until their arrests for the instant offenses. *Id*. He testified further that there was a hierarchy in the drug dealing operation, consisting of Jaquez at the top, then Nava, Rodriguez, and himself in the drug dealing operation. He testified that he occasionally worked at R&R and that the men transported methamphetamine in the wheels of R&R's vehicles. He testified that he began to use and became addicted to

methamphetamine after he joined the drug dealing operation. He also testified that he suffered an overdose, but that Rodriguez would not take him to a hospital for fear of being arrested.

[23] Moreida testified that Rodriguez supplied the methamphetamine for the hand-to-hand transactions on August 23 and October 28, 2016. On each occasion, he testified, the men had driven together to New Paris to pick up methamphetamine from "a little room where everything's done at . . . a little wooden desk" in Rodriguez's basement. *Id.* at 119. He testified further that when a buyer wanted a larger quantity of methamphetamine, he went to Rodriguez "[b]ecause that was my higher [up]." *Id.* at 118. He testified that, before making methamphetamine deliveries, he routinely dropped Rodriguez elsewhere beforehand, "[s]o [Rodriguez] wouldn't be seen [.]" *Id.* at 117.

[24] Moreida testified that, after they were arrested, Rodriguez sent letters warning him not to testify; telling him he "could always back out of [his] plea bargain"; "if [he] d[id]n't testify, [he] would be okay, looked out for . . . . [I]f [he] d[id] . . . it'd be the other way around"; to "watch [his] back"; and "if [he] t[ook] the blame that . . . everybody w[ould] accept [him] [and he] . . . wouldn't need nothing [sic] . . . ." *Id.* at 127, 130, 131. Moreida testified that, because he and his codefendants were incarcerated in the same cell block in advance of trial, he feared for his life, should they learn that he was a cooperating State's witness.

After the State presented its case-in-chief, Nava and Rodriguez rested. In its preliminary as well as final instructions, the trial court instructed the jury as follows regarding the dealing in methamphetamine charge:

> Before you may convict the defendant, the State must have proved each of the following elements beyond a reasonable doubt:
>
> 1. the defendant;
>
> 2. possessed, with intent to deliver;
>
> 3. methamphetamine;
>
> 4. and the amount of the drug involved was at least ten (10) grams.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant, ENEDEO RODRIGUEZ, JR., not guilty of Dealing in Methamphetamine, a Level 2 Felony charged in Count I.

Tr. Vol. V pp. 109, 129. The trial court defined "possess" and "possession"; however, it did not define "possessed, with intent to deliver."

The jury found Rodriguez guilty as charged. At his June 29, 2017 sentencing hearing, the trial court found, as aggravating circumstances, the following: (1) Rodriguez's prior criminal history; (2) he was on federal probation when he committed the instant offenses; (3) his record of violating supervised release and violating probation; (4) his extensive drug and alcohol abuse; (5) his use of methamphetamine until his arrest; (6) the probation department's finding that

he had a moderate risk to reoffend; (7) his threats to a cooperating witness against him; (8) he dealt methamphetamine at his house where a young child was present; and (9) he had not been deterred from criminal activity despite ample opportunities to conform his behavior. The trial court found the following mitigating circumstances: his lack of violent criminal history; the absence of guns or weapons in his home; he spent his drug dealing income on his five children; and his apologies to his children and to the trial court. The trial court sentenced Rodriguez to twenty-seven years on the Level 2 felony and five years on the Level 5 felony, suspended four years to probation, and ordered the sentences to be served consecutively. Rodriguez now appeals.

# Analysis

## I.    Speedy Trial

[27]   Rodriguez contends that the trial court improperly denied him a fast and speedy trial. The State counters that because Rodriguez was represented by counsel when he requested a speedy trial, the trial court acted within its discretion to strike and deny Rodriguez's pro se request.

[28]   Both the U.S. and Indiana Constitutions protect the right of an accused to a speedy trial. U.S. Const. amend. VI; Ind. Const. art. 1, § 12. "The speedy trial right is a fundamental principle of constitutional law that has been zealously guarded by our courts." *Cundiff v. State,* 967 N.E.2d 1026, 1027 (Ind. 2012) (internal quotations omitted). Indiana Criminal Rule 4(B)(1) generally implements the constitutional right of an accused to a speedy trial and provides:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion . . . .

Ind. Crim. R. 4(B)(1), emphasis added. The rule then lists conditions that excuse the failure to bring a defendant to trial within that time frame. *Cundiff,* 967 N.E.2d at 1028. In reviewing Criminal Rule 4(B) claims, we review factual findings under the clearly erroneous standard. *Austin v. State,* 997 N.E.2d 1027, 1040 (Ind. 2013). We review questions of law de novo. *Id.* at 1039.

[29] Our supreme court has stated that once counsel is appointed, a defendant speaks to the court through counsel. *Underwood v. State,* 722 N.E.2d 828, 832 (Ind. 2000). "When a defendant is represented by counsel, it is within the trial court's discretion to entertain or strike pro se motions." *Vance v. State,* 620 N.E.2d 687, 689 (Ind. 1993).

[30] Here, Rodriguez requested appointment of pauper counsel at his initial hearing on November 10, 2016; the trial court granted his motion. He subsequently moved orally for a speedy trial, which motion was denied so that he could confer with his counsel. Rodriguez again requested a speedy trial in a pro se letter to the trial court on November 16, 2016. Defense counsel asked the trial court to withdraw Rodriguez's request for a speedy trial on December 8, 2016, citing ongoing discovery and the need for additional time in which to prepare a defense. The trial court struck Rodriguez's request as a pro se filing after appointment of counsel and, in the alternative, denied it. The record is clear

that defense counsel for Rodriguez never pursued an early trial on Rodriguez's behalf. Under the foregoing circumstances, we find that requiring the trial court "to respond to both Rodriguez and his counsel would have effectively created a hybrid representation to which Rodriguez was not entitled." *See Underwood,* 722 N.E.2d at 832. Because Rodriguez's requests for speedy trial were made after appointment of counsel, the trial court was not required to respond. Rodriguez has not established that the trial court improperly denied him a fast and speedy trial.

[31] Additionally, we note that criminal Rule 4 and subsequent interpretations have recognized that court congestion and other exigent circumstances may justify a reasonable delay beyond the seventy-day period. *See Loyd v. State,* 272 Ind. 404, 408, 398 N.E.2d 1260, 1265, *cert. denied.* The record here reveals that the trial court's continuance and application of the court congestion exception were factually supported. Although Rodriguez and his counsel made an extensive record as to his desire for a speedy trial on April 3, 2017, the trial court cautioned of various risks—ongoing discovery, inadequate preparation time for defense counsel, and the likelihood that another matter would trump Rodriguez's April 3, 2017 jury trial.[8] The record further reveals that the trial court sought to accommodate Rodriguez, while also urging him to heed the

---

[8] Not only did another jury trial displace Rodriguez's on the trial court's April 3, 2017 calendar but, as the trial court later explained, the defendant in that case entered a plea on the morning of trial, when a jury was already impaneled and "ready to go." Tr. Vol. II pp. 53-54.

advice of his counsel. The record also reveals that, absent a continuance, Rodriguez and his counsel would have been at a considerable disadvantage without adequate time to review newly-disclosed, incriminating surveillance and documentary evidence. Further still, Rodriguez was initially to be tried with four codefendants—most of whom were already scheduled for jury trial on June 5, 2017, which was the alternate trial date that the trial court proposed to Rodriguez.[9] Lastly, we note that the continuance period—from April 2, 2017 to June 5, 2017—was relatively short, at less than two months. *See* Criminal Rule 4(C) (allowing continuance of trial for "a reasonable time"). Based upon the foregoing, we conclude that the trial court's continuance of Rodriguez's jury trial for reasons of court congestion and its handling of Rodriguez's speedy trial request was not clearly erroneous.

## II. *Motion to Sever*

[32] Rodriguez argues that counts I and II were joined solely because they were of a similar character and that he was entitled to severance as a matter of right. We review arguments that a trial court improperly denied a motion to sever as a matter of right de novo. *Booker v. State,* 790 N.E.2d 491, 494 (Ind. Ct. App. 2003). If the defendant was not entitled to severance as a matter of right, the trial court has discretion whether to grant severance, and we will review the trial court's decision for an abuse of discretion. *Ben-Yisrayl v. State,* 690 N.E.2d

---

[9] With the exception of Nava, each of Rodriguez's codefendants ultimately entered guilty pleas before the June 5, 2017 jury trial setting.

1141, 1146 (Ind.1997), *cert. denied*. We will reverse for an abuse of discretion "only upon a showing of clear error." *Id.* (quoting *Davidson v. State,* 558 N.E.2d 1077, 1083 (Ind. 1990)).

[33] We initially note that the trial court instructed the jury "to consider the evidence as it may apply to each count individually and separately from the other counts." App. Vol. II p. 132. We further note that a jury is presumed to have followed the trial court's admonishments, and when the jury is properly instructed, we presume they followed such instructions. *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001); *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015

[34] Where offenses have been joined because the defendant's underlying acts are connected together or constitute parts of a single scheme or plan, we review the trial court's decision on severance for an abuse of discretion. *Pierce v. State,* 29 N.E.3d 1258, 1264 (Ind. 2015). Indiana Code Section 35-34-1-9(a) provides that:

> …[T]wo (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:
>
> (1) are of the same or similar character, even if not part of a single scheme or plan; or
>
> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Subsection 9(a)(1) refers to the nature of the charged offenses, and subsection 9(a)(2) refers to the operative facts underlying those charges. *Pierce v. State*, 29 N.E.3d 1258, 1265 (Ind. 2015).

[35] The defendant shall have the right to severance of the offenses "[w]henever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character[.]" Ind. Code § 35-34-1-11.

> In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> (1) the number of offenses charged;
>
> (2) the complexity of the evidence to be offered; and
>
> (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

*Id*.

[36] In *Harvey v. State*, 719 N.E.2d 406, 408 (Ind. Ct. App. 1999), the defendant was charged in connection with two robberies that were committed mere days apart. During each robbery, one robber—the taller of the men—pistol-whipped the victims, while the shorter man assisted. Noting that robberies inherently share certain similarities, a panel of this court deemed the facts "sufficient to show a

'series of acts connected together' induced by the common motive to rob" and determined that Harvey was not entitled to severance as matter of right. *Id*. at 409.

[37]   Here, in denying the motion to sever, the trial court found a sufficient connection between counts I and II to justify allowing the State to go forward. The yearlong investigation exposed the inner workings of a drug dealing operation in which Nava, Jaquez, Rivera, Moreida, and Rodriguez acted, independently and in concert, to obtain, exchange, package, transport, and sell methamphetamine. Through coordination, coded telephone calls, trips to each other's houses, Rodriguez's quick-turnaround jaunts to New Paris and Fort Wayne to obtain more methamphetamine, use of R&R's vehicles for drug transport, and pre-arranged security measures for the senior dealers in the hierarchy, the four men conducted their drug business, induced by their common motive to deal methamphetamine.

[38]   As we did in *Harvey*, we conclude that the foregoing evidence was sufficient to show a series of acts connected together or constituting parts of a single scheme or plan, induced by a common motive to deal methamphetamine. Rodriguez has not demonstrated that the trial court's denial of his motion for severance was an abuse of discretion.

### III.   *Sufficiency of the Evidence*

[39]   Rodriguez argues that insufficient evidence exists to support his convictions. When reviewing the sufficiency of the evidence needed to support a criminal

conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State,* 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

### A. Level 2 Felony Dealing in Methamphetamine

[40] Rodriguez argues that the State failed to present "evidence … that [he] was ever seen in actual possession of methamphetamine" or that he had the requisite intent to deliver methamphetamine. Appellant's Br. p. 34.

[41] To convict a defendant of Level 2 felony dealing in methamphetamine, the State is required to prove the following:

(a) A person who:

. . .

(2) possesse[d], with intent to:

. . .

(C) deliver

. . .

methamphetamine, pure or adulterated; commit[ted] dealing in methamphetamine, a Level 5 felony, except as provided in subsections (b) through (e).

(b) A person may be convicted of an offense under subsection (a)(2) only if:

(1) there is evidence in addition to the weight of the drug that the person intended to manufacture, finance the manufacture of, deliver, or finance the delivery of the drug.

. . .

(e) The offense is a Level 2 felony if: (1) the amount of the drug involved is at least ten (10) grams.

I.C. § 35-48-4-1.1.

[42] Here, the State presented witness testimony distinguishing between recreational drug users and drug dealers. An undercover officer testified that dealers generally possess large quantities of the drug as well as supplies needed to weigh, distribute, package, store, and transport the drugs. Here, investigators recovered methamphetamine from Rodriguez's basement and from his truck speaker. They also found a cutting agent, digital scales, industrial resealable bags, cellophane in bulk quantities, and numerous cell phones. Reasonable inferences that Rodriguez possessed methamphetamine with intent to deliver may be drawn from the considerable amount of methamphetamine and drug dealing paraphernalia, *i.e.*, digital scales, cutting agent, countless resealable baggies, vacuum sealers, etc., that were found in his basement (consistent with

Moreida's testimony) and hidden in the speaker of his truck, where the State presented evidence that the house and truck contained proof of his ownership. *See Enamorado v. State,* 534 N.E.2d 740, 742-43 (Ind. 1989); *McGuire v. State,* 613 N.E.2d 861, 864 (Ind. Ct. App. 1993) (Circumstantial evidence of intent to deliver, such as possession of a large quantity of drugs, scales, plastic bags, and other paraphernalia, can support a conviction.).

[43] The State also presented evidence that investigators intercepted and recorded a telephone conversation in which Nava and Jaquez mentioned being out of methamphetamine, which complaint coincided with Rodriguez's quick trip to Fort Wayne and immediate return, after which Nava and Jaquez rendezvoused with him and were once again fully stocked with methamphetamine.

[44] Additionally, Moreida testified as follows: to fill larger orders for methamphetamine, he obtained additional drugs from Rodriguez; he telephoned Rodriguez and traveled to Rodriguez's home to retrieve methamphetamine immediately before making deliveries on August 23 and October 22, 2016; Rodriguez used R&R's vehicles to conceal and transport large quantities of methamphetamine; Rodriguez was safely ensconced nearby during two of Moreida's deals with undercover investigator(s), having both supplied the methamphetamine and having had Moreida take him a safe distance away until the deal was done, as was customary in the operation. Based on the foregoing, we conclude that the State presented sufficient evidence to support Rodriguez's conviction for Level 2 felony dealing in methamphetamine.

### *B. Level 5 Felony Corrupt Business Influence*

[45] To convict Rodriguez of Level 5 felony corrupt business influence, the State was required to prove that he, along with Moreida, Jaquez, Rivera, and Nava, "while employed by or associated with an enterprise, knowingly conducted or otherwise participated in the activities of that enterprise through a pattern of racketeering activity." App. Vol. II p. 108; I.C. §§ 35-46-6-2(2); 35-41-2-4.

[46]
> First, we must determine whether [Rodriguez] was associated with an "enterprise," which is defined, among other things, as "a union, an association, or a group, whether a legal entity or merely associated in fact." I.C. § 35-45-6-1(c)(2). "[T]he hallmark of an enterprise is structure . . . . A RICO enterprise is an ongoing group of persons 'associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'" Additionally, because a RICO enterprise is more than a group who got together to commit a pattern of racketeering activity, there should be sufficient evidence to infer that the group is an "'organization with a structure and goals separate from the predicate acts themselves.'"

*See Purvis v. State,* 87 N.E.3d 1119, 1126 (Ind. Ct. App. 2017) (internal citations and quotations omitted).

[47] Here, the State presented the following evidence that Rodriguez, Moreida, Jaquez, Rivera, and Nava actively participated in a drug dealing enterprise with the goal of selling methamphetamine: (1) Rodriguez recruited Moreida into the group of dealers in which Rodriguez was at the higher end of the hierarchy; (2) there was significant coordination between the five men, (i.e., Rodriguez sold methamphetamine with Jaquez; Moreida sold methamphetamine for

Rodriguez; and Rodriguez supplied the dealers with methamphetamine); (3) Rodriguez waited nearby as Moreida completed transactions on August 23 and October 22, 2016; (4) the dealers maintained regular contact via coded text messages and telephone calls and frequented each other's houses and/or Rodriguez's place of business, R&R; and (6) undercover investigators made hand-to-hand purchases of methamphetamine from Moreida (four times), Nava (five times), and Jaquez (two times);

[48] Although investigators did not buy methamphetamine directly from Rodriguez, the State presented the following evidence of his role as a/the supplier to the drug dealing operation: on August 23 and October 28, 2016, Moreida telephoned, met with, and "trip[ped]" to retrieve methamphetamine from Rodriguez's house before completing methamphetamine transactions; Rodriguez used R&R's vehicles to transport large quantities of methamphetamine; Rodriguez traveled between his codefendants' houses and to other cities shortly before methamphetamine transactions; investigators found more than 240 grams of methamphetamine, as well as a cutting agent, a measuring cup, drug paraphernalia, industrial resealable bags, digital scales, vacuum sealing machines, and a bulk quantity of cellophane used in packaging drugs for resale in Rodriguez's house. *See McGuire,* 613 N.E.2d at 864.

[49] Based on the foregoing, the State presented sufficient evidence that Rodriguez was associated with an "enterprise" with a structure and goals separate from the predicate acts. *See Purvis,* 87 N.E.3d at 1126; *see Waldon v. State,* 829 N.E.2d 168, 176-77 (Ind. Ct. App. 2005) (holding there was sufficient evidence of a

RICO enterprise where the defendant "was the ringleader of a group of individuals organized to carry out crime"), *disapproved on other grounds in Jackson v. State,* 50 N.E.2d 767, 775 (Ind. 2016).

Next, we must determine whether Rodriguez engaged in "racketeering activity," which means "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation" of any of the listed offenses. It is undisputed that racketeering activity includes dealing in methamphetamine. *See* I.C. § 35-45-6-1(e)(29).

Third, we consider whether the dealers' behavior amounted to a "pattern of racketeering activity," which is defined as "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents . . . ." I.C. § 35-45-6-1(d).

> [T]he statute does not apply to sporadic or disconnected criminal acts. Thus, although failure to prove continuity [of the acts] is not necessarily fatal to a corrupt business influence conviction—since it is not a separate element in the statute—the State must still demonstrate that the criminal incidents were in fact a "pattern" and not merely "isolated" incidents. And evidence of a degree of continuity or threat of continuity is certainly helpful in establishing the necessary "pattern."

*Purvis*, 87 N.E.2d at 1127 (quoting *Jackson v. State*, 50 N.E.3d 767, 775-76 (Ind. 2016).

Here, the State established that the drug dealers' crimes were neither isolated nor sporadic by presenting evidence of the interrelated nature of their activities, including the methamphetamine transactions involving Rodriguez and Moreida on August 23 and October 22, 2016; the dealers' coordinated operating practices; the frequency, extent, and nature of their interactions; and that their drug transactions followed similar patterns and timeframes and were completed with the same intent, which was to sell methamphetamine.

Based on the foregoing, we find that the State presented sufficient evidence to support Rodriguez's conviction for Level 5 felony corrupt business influence.

## IV.    *Jury Instruction*

Rodriguez argues that, in instructing the jury, the trial court "failed to give a separate instruction on intent to deliver" and "effectively misled the jury on the law regarding [the] charged offense." Appellant's Br. p. 40.

> With no separate instruction, and the coupl[ing] of intent to deliver with possession in listing the necessary elements of the charged offense, the jury was giv[en] the impression that if they found [Rodriguez] had constructive possession of the methamphetamine … then . . . he [necessarily] also had the requisite intent to deliver . . . .

*Id*. Because defense counsel failed to object, Rodriguez asserts that the alleged error in instructing the jury constituted fundamental error.

Our Supreme Court set out the applicable standard of review as follows:

Because instructing the jury is a matter within the sound discretion of the trial court, we will reverse a trial court's decision to tender or reject a jury instruction only if there is an abuse of that discretion. We determine whether the instruction states the law correctly, whether it is supported by record evidence, and whether its substance is covered by other instructions. "Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case."

Where, as here, the defendant failed to preserve an alleged instructional defect, the objection is waived, and reversal is warranted only in instances of fundamental error. "Error is fundamental if it is 'a substantial blatant violation of basic principles' and where, if not corrected, it would deny a defendant fundamental due process." This exception to the general rule requiring a contemporaneous objection is narrow, providing relief only in "egregious circumstances" that made a fair trial impossible.

*Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016) (internal citations omitted).

[56] In the virtually-identical Preliminary Instruction Number 3 and Final Instruction Number 4, the trial court enumerated the elements of Level 2 felony dealing in methamphetamine as follows:

Before you may convict the Defendant, the State must have proved each of the following elements beyond a reasonable doubt:

1. The Defendant;

2. *possessed, with intent to deliver*

3. methamphetamine

4. and the amount of the drug involved was at least ten (10) grams.

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant, ENEDEO RODRIGUEZ, JR, not guilty of Dealing in Methamphetamine, a Level 2 Felony, Charged in Count I.

App. Vol. II pp. 109, 129 (emphasis added).

[57] Rodriguez correctly states that it is fundamental error for the trial court to fail to give an instruction setting forth all the elements of the offense. *Nantz v. State,* 740 N.E.2d 1276, 1282 (Ind. Ct. App. 2001). We find no such error here, however. From our review of the record, by stating the second element of the offense as it did and separating the mens rea and the possession components, the trial court alerted jurors that *both* components of the clause comprised the element. Thus, the instruction's "possessed, with intent to deliver" is the functional equivalent of "possessed, [*and*] with intent to deliver...."

[58] Coupled with the trial court's repeated instruction to jurors that "[if] the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant . . . not guilty," we cannot say that the jury was misled into believing that evidence that Rodriguez constructively possessed methamphetamine necessarily meant that he intended to deliver the methamphetamine. *Id*. at 110. As stated above, the State presented evidence from which the jury could reasonably and independently infer that Rodriguez

intended to deliver methamphetamine. *See McGuire,* 613 N.E.2d at 864 (holding that possession of a large quantity of drugs, scales, plastic bags, and other paraphernalia is circumstantial evidence of intent to deliver). Rodriguez has not persuaded us that he was deprived of a fair trial as a result of the court's instructions to the jury; we find no fundamental error.

## V. Sentence

[59] Rodriguez argues that his sentence is inappropriate in light of the nature of his offenses and his character. We may revise a sentence if it is "inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). Whether the reviewing court regards a sentence as inappropriate turns on a "sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State,* 895 N.E.2d 1219, 1224 (Ind. 2008). This Court "must give 'deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give due consideration to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions.'" *Gil v. State,* 988 N.E.2d 1231, 1237 (Ind. Ct. App. 2013) (quoting *Stewart v. State,* 866 N.E.2d 858, 866 (Ind. Ct. App. 2007)). Rodriguez bears the burden of persuading us that his sentence is inappropriate. *Reid v. State,* 876 N.E.2d 1114, 1116 (Ind. 2007).

[60] The advisory sentence is the starting point to determine the appropriateness of a sentence. *See Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). The advisory sentence for a Level 2 felony is

seventeen and one-half years, with a minimum sentence of ten years and a maximum sentence of thirty years. Ind. Code § 35-50-2-4.5 (2014). Here, the trial court imposed an enhanced sentence of twenty-seven years for Level 2 felony dealing in methamphetamine. The advisory sentence for a Level 5 felony is three years, with a minimum sentence of one year and a maximum of six years. I.C. § 35-50-2-6 (2014). Here, the trial court imposed an enhanced five-year sentence for Level 5 felony corrupt business influence.

[61] As to the nature of the offenses, Rodriguez was among the architects of and actively participated in a drug dealing operation in which he, Jaquez, Nava, Rivera, and Moreida dealt methamphetamine. Rodriguez recruited Moreida to sell methamphetamine for the operation and to store smaller quantities of methamphetamine at his house. Rodriguez obtained, packaged for sale, and transported methamphetamine, which he supplied to Jaquez, Nava, Rivera, and Moreida for their larger-scale transactions. Ranked at the higher end of the hierarchy, Rodriguez schemed and incorporated measures to hide his key role in the drug operation, including using coded language on the phone with his fellow dealers; using R&R's vehicles to transport methamphetamine; shuttling methamphetamine between cities, vehicles, and houses; and waiting at a safe distance while an underling (Moreida) completed transactions. A police search of Rodriguez's house and vehicle yielded more than ten times the statutory amount of methamphetamine required to prove Level 2 felony dealing in methamphetamine, as well as other evidence of dealing activity, i.e., a cutting

agent, digital scales, resealable bags, vacuum sealers, six to eight cell phones, and bulk quantities of cellophane.

[62] With regard to his character, Rodriguez has multiple misdemeanor and felony convictions, including convictions for class A misdemeanor possession of marijuana/hash (2000), class D felony possession of marijuana/hash (2001), class A misdemeanor driving while suspended (2004, 2006 X 2), and conspiracy to possess with intent to distribute Schedule I controlled substance – marijuana (2006). He was incarcerated at the age of twenty-five until the age of thirty-three. He was on federal probation when he committed the instant offenses.

[63] Rodriguez's refusal to address his substance abuse also reflects poor on his character. The pre-sentence investigation report provides that he began using cocaine at age fifteen and used it regularly, with his last known cocaine use occurring two months before his arrest in November 2016. Rodriguez also reported that he used methamphetamine from October 2014 until his arrest.

[64] The record sheds additional light on Rodriguez's character as follows: he recruited his friend's brother, Moreida, into dealing methamphetamine for him, and Moreida became acutely addicted to the drug. Because Rodriguez's primary concern was shielding himself from prosecution, he refused to take Moreida to an emergency room when he suffered an overdose; enlisted Moreida to store methamphetamine at his house; ensured that Moreida assumed more risk, including making the transaction arrangements with prospective buyers and completing deliveries as Rodriguez waited nearby;

suggested at trial that methamphetamine found in his house belonged to his wife; and threatened Moreida for cooperating with the State.

[65] The yearlong investigation into area suppliers of methamphetamine revealed Rodriguez's role in the drug dealing operation. Given his prior criminal history, extensive drug and alcohol abuse, commission of the instant offenses while on federal probation, unwillingness to abandon criminal activity despite ample opportunities to do so, his threats to a cooperating State witness, and the lengths he took to evade capture, we cannot say that his thirty-two-year sentence is inappropriate in light of the nature of his offenses and his character.

## Conclusion

[66] The trial court did not violate Rodriguez's right to a speedy trial. Nor did it err in denying his motion to sever the charges against him. Sufficient evidence exists to support his convictions for Level 2 felony dealing in methamphetamine and Level 5 felony corrupt business influence. The trial court's instructions to the jury did not give rise to fundamental error. Rodriguez's sentence is not inappropriate. We affirm.

[67] Affirmed.

Vaidik, C.J., and Pyle, J., concur.